### Stanley Graff, Appellee, v. Illinois Steel Company, Appellant.

### Gen. No. 14,127.

1. VERDICT—*when not disturbed.* A verdict will not be set aside as against the greater weight of the evidence unless manifestly so.

2. VERDICT—*when not excessive.* *Held*, that a verdict for $2,500. rendered in an action for personal injuries is not excessive where the evidence tended to show that the plaintiff who earned his livelihood by manual labor, received an injury to his hand which rendered it substantially useless.

3. MASTER AND SERVANT—*when doctrine of assumed risk does not apply.* An employe does not assume the risk of defects in machinery and appliances of which he is ignorant.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding. Heard in this court at the October term, 1907. Affirmed. Opinion filed January 18, 1909.

KNAPP, HAYNIE & CAMPBELL, GILBERT R. CALL and WILLIAM BEYE, for appellant.

CHARLES E. MILROY and F. H. NOVAK, for appellee.

MR. PRESIDING JUSTICE ADAMS delivered the opinion of the court.

The plaintiff, Stanley Graff, sued the defendant, the Illinois Steel Company, in case for negligence, *per quod* plaintiff was injured. The pleadings consist of the declaration and a plea of the general issue. The defendant, at the close of the plaintiff's evidence and again at the close of all the evidence, moved the court to take the case from the jury, and presented to the court written instructions to that effect, and the court overruled said motions and refused the instructions. The jury found the defendant guilty and assessed the plaintiff's damages at $2,500; motions of defendant for a new trial and in arrest of judgment were overruled and judgment was rendered on the verdict.

The contentions of defendant's counsel are, that the court erred in not taking the case from the jury, and in rulings on evidence and instructions; that the verdict is contrary to the weight of the evidence, and that the damages are excessive.

The plaintiff was employed by the defendant July 5, 1903. His first work in defendant's employ was chipping, which he continued for about three months, when he was put to rivetting, in which work he was engaged something more than three weeks, when November 13, 1903, he was put to work with the fitting-up gang. At the place where he was sent to work an iron girder, between 16 and 20 feet long and between 3 and 4 feet wide, with a flange at its lower side, and with a piece of iron about three feet in length, bolted to it, was suspended about two feet above certain other iron girders on the ground below it. It was suspended edgewise by means of two hooks, one being attached to it about five feet from each end of

it. The hoisting and lowering of the girder was done by a hoisting apparatus or machinery, the motive power of which was air. There were two ropes hanging down near the hooks at the ends of the girder, by pulling one of which the girder was hoisted and by pulling the other it was lowered. At the time of the accident a Mr. Heidel, head of the fitting gang, was operating the ropes at one end of the girder, and Albert Jablonowski was operating the ropes at the other end, where the plaintiff was. The plaintiff testified, in substance, that Heidel motioned to him to take the bolt from off the girder, to do which he had to reach under the girder to unscrew the nut which held the bolt, and as he was so doing, the end of the girder next to him dropped fast and suddenly and his left hand, which was edgeways, underneath the girder, was caught between it and a girder beneath it. The evidence shows that only the end of the girder next to which the plaintiff was, dropped, and that it rested on one of the girders on the ground, so that the girder slanted from the end which remained suspended to the end which dropped, leaving a space of about two inches between the fallen girder and the one beneath it, and the plaintiff's hand was caught in that space. Albert Jablonowski testified that he lowered the end of the girder next to the plaintiff in obedience to a signal to lower it. He says he had been running the hoist for the laboring gang for about a year before the time of the accident; that Kowaliski was the labor boss and Jochim was the head boss, and that he told Jochim two days before the accident that the tackle of the hoist was out of order, and that he, witness, would not work with it, and that, on the day of, and before the accident, he told Kowaliski that the hoist was out of order, and Kowaliski said, "You can work it." Witness further testified that the hoist worked loose, that it would hoist up right, but not lower; that if it was started to lower it would run right down, and that, when he pulled the rope, he was trying to lower the

girder about half an inch, but it ran right down—dropped; also that if the hoist was in good condition he could stop it at any place. In this last the witness is corroborated by the testimony of Jochim, called by the defendant, who testified, on cross-examination, that "if a hoist is in good running order an object will never drop suddenly." Jablonowski also testified that they did not go ahead and use the hoist, on the girder, after the accident.

Defendant's counsel rely on the testimony of Jochim, Froh, Cairns and Pence, witnesses for defendant, who testified, in substance, that the girder descended slowly and that the hoist was in good condition.

Jochim testified that nothing was said to him by plaintiff, or any person, about the hoist being out of repair, or not working properly. Kowaliski was questioned and answered as follows:

"Q. The day before he was injured, or the day he was injured either, did any one say to you that this air hoist, on which he was injured, was out of order, or no good, or anything of that kind?

A. I don't remember very good.

Q. Do you remember of any one saying anything of that kind to you?

A. I don't remember."

The evidence of Froh is, to say the least, very unsatisfactory. He says he was working at a rotary planer forty feet distant from plaintiff; that plaintiff must have reached under the girder to take out a bolt, or something, and that some way or other, Heidel and another fellow lowered the girder down on plaintiff's arm; also that he did not notice the hoist at the time of the accident, but he used it the next day; also that the girder did not drop, but went down easily. On cross-examination he testified that the first thing which attracted his attention to the fact that plaintiff was injured was some hallooing.

Cairns testified that the hoist was not out of order

that he knew of. His cross-examination shows that he was attending to his own work, heating rivets, and looking out for himself, and paying very little attention to the operation of the hoisting apparatus.

Pence, on cross-examination, testified: "At the time when I saw this man's arm under there, and saw him pull it out, the girder was suspended in the air, both ends even. I never saw that girder with one end down and the other up. I didn't see one end drop down and the other up." This evidence shows conclusively that the witness was paying little or no attention to what occurred at the time of the accident, because it is established beyond doubt by the evidence, that one end of the girder fell, and the other end did not.

Heidel, who was operating the ropes at the end which remained suspended, was in court at the time of the trial. He had ample opportunity to observe what occurred before and at the time of the accident, but he was not called as a witness.

The court properly submitted the case to the jury. It was the province of the jury to decide on which side the greater weight of the evidence was, and we cannot set their verdict aside, unless it is manifestly against the preponderance of the evidence, which we do not think it is. We find no reversible error in the court's rulings on evidence. The witness Jochim testified that the hoist was used continually after the accident, and was then asked whether it was repaired after the accident, which question the court ruled against. This, however, did not prejudice defendant, as Harper, defendant's witness, testified that the hoist was not repaired after the accident.

Counsel contend that the sole cause of the accident was the negligence of Jablonowski. If this were true, it could only avail the defendant if Jablonowski and the plaintiff were fellow servants, which counsel for defendant do not claim, but, on the contrary, expressly disclaimed on the trial, saying of Jablonowski: "There

is no charge in the declaration of the negligence of this man. Consequently, there is no fellow servant question involved. If this man's negligence caused the injury, then they cannot recover, as the declaration is on the exclusive theory of the ill repair of this hoisting apparatus.'' There is no evidence that Jablonowski, in operating the rope to lower the girder, in obedience to the order given him, was in the least negligent.

Counsel for defendant asked four instructions, the giving any one of which would have excluded from the consideration of the jury the plaintiff's evidence tending to prove that the hoisting apparatus was in an unsafe and dangerous condition. The instructions were properly refused. Counsel object to plaintiff's second instruction, on the ground that it eliminates the question of assumed risk. The question of assumed risk is not involved in the cause. An employe does not assume the risk of defects in machinery or appliances of which he is ignorant. The plaintiff had never operated the hoist, nor had he had any opportunity to discover defects, if any, in it. The court did not err in giving the instruction.

The plaintiff was between 41 and 42 years old at the time of the accident, and, so far as appears from the evidence, was a competent, able-bodied man. He testified that after the accident his hand was black and blue and swollen, and so continued for more than a year; that his fingers are stiff and his hand painful, and that he has not been able to do any work with it. He testified that for two or three weeks after the accident two of defendant's doctors treated him, and after that time he was treated by doctors Kobalski and Train, at a free dispensary.

Dr. Krezminski, witness for plaintiff, testified that he examined the plaintiff's hand on several occasions, using an X-ray on one occasion, and found the joints swollen and the middle metacarpal bone fractured, the fracture being a little oblique, and the fractured bone

knitted together, the union being such as to limit motion, and that the injury is permanent and will grow worse. Dr. Tobias, called by plaintiff, examined the hand a short time before the trial, and testified that it was deformed and its motion partly lost; that plaintiff could not squeeze with it, and that it would never be any better.

Doctors Burry and Behrendt were called as witnesses by the defendant. The former testified that he examined plaintiff's hand in December, 1903, and that it was then swollen and the voluntary motions of the fingers were slightly limited; that he took an X-ray picture of the hand and there was no fracture of the bones of the hand, and the circulation was fair, and his opinion at that time was that there would be no permanent disability. Doctor Behrendt testified that he examined plaintiff's hand November 13, 1903. His testimony was substantially the same as that of Doctor Burry.

Neither of defendant's medical witnesses testified as to whether the condition of plaintiff's hand, as it was at the trial, could be improved by treatment, or whether or not the condition is permanent.

The jury, before whom the plaintiff appeared and testified, had the opportunity of seeing his hand. The following occurred in the examination of the plaintiff:

"Q. Now after the six months when you ceased treating with the doctors, what was the condition of your hand then?

A. Well the hand—the finger been stiff and they are stiff to-day.

Q. Can you close your hand like this? Close it as far as you can.

A. (Illustrating). That is all I can close; pains too much.

Q. What if any effect does it have on your hand, or arm, if you try to lift anything or close your hand?

A. I cannot hardly lift anything. If I close it pains me way to my shoulder, and goes right in my body.

Q. And has that condition continued ever since the injury, all the time?

A. Yes, sir.

Q. Has your hand been painful and hurt you all the time since you were hurt?

A. Yes, sir.

Q. Now before this injury what was the condition of your hand? Did it ever hurt you before that?

A. No sir, just as well as this one, the right one; I could lift, I could do any work with this hand just as well as the right hand."

There is in the evidence, if credited by the jury, a sufficient basis for a finding that the condition of the plaintiff's hand, as a result of the injury, is such as to render it substantially useless to him in the performance of manual labor, for the remainder of his life. We find no sound reason for interfering with the assessment of damages by the jury.

The judgment will be affirmed.

*Affirmed.*